**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **BROADCAST MUSIC, INC., et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **EP-13-CV-32-KC** |
| | § | |
| **JAMES MICHAEL ARMSTRONG,** | § | |
| | § | |
| **Defendant.** | § | |

<u>**ORDER**</u>

On this day, the Court considered Plaintiffs' Motion for Summary Judgment (the "Motion"), ECF No. 34, in the above-captioned case (the "Case"). For the reasons set forth herein, the Motion is **GRANTED**.

**I.      BACKGROUND**

The Case is an action for copyright infringement arising from the unauthorized public performance of musical works.[1] Unless otherwise noted, the following facts are undisputed:

Plaintiff Broadcast Music, Inc. ("BMI") is a "performing rights society" that licenses the public performance of nondramatic musical works on behalf of the owners of the copyrights of such works. Pls.' Proposed Undisputed Facts ("PUF"), ECF No. 35-24 ¶ 1; *see* 17 U.S.C. § 101. BMI has acquired non-exclusive public performance rights for over 7.5 million works from a multitude of copyright owners. PUF ¶¶ 2-3; Decl. of Kerri Howland-Kruse ("Howland-Kruse Decl."), ECF No. 35-1 ¶¶ 2, 5. BMI sells "blanket licenses" to music users such as bars and restaurants to publicly perform any of the works in its repertoire, thereby obviating the need for

---

[1] Copyright law distinguishes between musical works (i.e., compositions) and sound recordings. *See* 17 U.S.C. § 102(a). The Case concerns only musical works, not sound recordings.

the music users to obtain licenses on a work-by-work basis. PUF ¶ 4; Howland-Kruse Decl. ¶ 2. The other plaintiffs in the Case are entities that own the copyrights that were allegedly infringed. PUF ¶ 2; Howland-Kruse Decl. ¶ 4. Those plaintiffs have granted to BMI the right to issue public performance licenses for all the works at issue, as well as the right to sue and seek damages for the infringement of their copyrights in these works. PUF ¶ 4; Howland-Kruse Decl. ¶ 5.

Defendant James Michael Armstrong ("Armstrong") is a limited partner in Three Legged Monkey, L.P. (the "Limited Partnership"). Aff. of James Michael Armstrong ("Armstrong Aff."), ECF No. 38-2 ¶ 2. Armstrong and others formed the Limited Partnership on or about April 15, 2004, for the purpose of operating Three Legged Monkey ("TLM"), a bar and restaurant located at 1550 Hawkins Boulevard in El Paso, Texas. *Id.* TLM operated at that location until November 3, 2013, when it was "locked-out" by its landlord for nonpayment of rent. *Id.*

Plaintiffs instituted the Case on February 4, 2013, and filed their First Amended Verified Complaint, ECF No. 15 (the "Amended Complaint"), on June 11, 2013. The Amended Complaint alleges that Armstrong caused fifteen of Plaintiffs' works (the "Songs")[2] to be publicly performed without authorization at TLM on March 2, 2012, and March 3, 2012,[3]

---

[2] The Songs include "Bad Moon Rising," "Boogie Shoes," "Born To Be Wild," "Funkytown," "Have You Ever Seen The Rain," "Iris," "Mammas Don't Let Your Babies Grow Up To Be Cowboys," "Under The Bridge," "Rebirth of Slick Cool Like Dat," "Old Time Rock And Roll," "I Love This Bar," "Neon Moon," "Hard to Handle," "Just Can't Get Enough," and "Children's Story." As Plaintiffs did not attach a schedule of the Songs to the Amended Complaint, the Court draws upon the schedule attached to Plaintiffs' initial Verified Complaint, ECF No. 1-1. The list of Songs on that schedule comports with the summary judgment evidence attached to the Motion.

thereby infringing Plaintiffs' copyrights. Am. Compl. 5-6. Plaintiffs seek an injunction

prohibiting further infringement of copyrighted works licensed by BMI, statutory damages, and

costs and attorney's fees. *Id.* at 6-7.

On July 24, 2013, the Court denied Armstrong's motion to dismiss, holding that Plaintiffs

stated a claim against Armstrong and that the Limited Partnership was not a necessary party. *See*

Order, ECF No. 20. Armstrong then filed a third-party complaint against the Limited Partnership

on November 8, 2013, alleging that he is entitled to indemnity as an officer of the Limited

Partnership, or alternatively that he is entitled to contribution because the Limited Partnership

was a joint tortfeasor. *See* Orig. Third Party Compl., ECF No. 27. However, Armstrong has not

filed proof of service on the Limited Partnership, nor has the Limited Partnership otherwise

appeared in the Case.

Plaintiffs filed the Motion on April 11, 2014, along with the Proposed Undisputed Facts[4]

and various supporting materials. By the Motion, Plaintiffs argue that they are entitled to

summary judgment on the entirety of their claim. Mot. ¶ 32. Specifically, Plaintiffs assert that a

BMI investigator visited TLM on the dates in question, observed that music was being

performed by live bands and a DJ, recorded the music that was performed, and during the course

of his visit on March 2, recognized five of the Songs.  PUF ¶¶ 11-12; Decl. of Lawrence Stevens

("Stevens Decl."), ECF No. 35-17 ¶ 10; Certified Infringement Report of March 2, 2012 ("March

---

[3] In various documents in the record, Plaintiffs sometimes indicate that some of the alleged infringement occurred on March 4, 2012. It appears to the Court that this discrepancy is rooted in the fact that certain Songs were played in the early morning hours of March 4, albeit in a session that began on March 3. *See* Def's Resp. to Pls.' First Set of Interrog., ECF No. 35-21 ¶ 9; Certified Infringement Report of March 3, 2012, ECF No. 39-2 at 7. In any event, as the precise dates of the alleged infringement are not pertinent to the Court's disposition of the Motion, and the key summary judgment evidence is contained in reports dated March 2 and March 3, the Court refers only to those two dates without deciding whether any infringement instead occurred on March 4.

[4] Confusingly, a section of the Motion is also headed "Proposed Undisputed Facts." Mot. 1-2. That section echoes, predominantly word-for-word, albeit with different paragraph breaks, the contents of the Proposed Undisputed Facts. The Court's citations are only to the separately filed Proposed Undisputed Facts, ECF No. 35-24.

2 Report"), ECF No. 35-18 at 1-13; Certified Infringement Report of March 3, 2012 ("March 3 Report"), ECF No. 39-2 at 6-13. The investigator transmitted his recordings to BMI, whereupon other BMI employees listened to them and subjected them to a computerized analysis, and thereby identified the other ten Songs. PUF ¶¶ 12-13; Stevens Decl. ¶¶ 11-13; March 2 Report at 13-22; March 3 Report at 13-19. Stevens, a Vice President at BMI, avers that BMI did not issue a license permitting the performance of the Songs at TLM, and that to his knowledge, none of the other Plaintiffs issued such a license. Stevens Decl. ¶ 4. BMI argues that the performances of the Songs therefore constituted copyright infringement. Mot. ¶¶ 8-12. BMI additionally argues that Armstrong, by virtue of his ownership interest in TLM and his supervisory role there, should be held individually liable for the infringement. Mot. ¶¶ 13-19.

Armstrong has filed a Response to the Motion ("Response"), ECF No. 38, along with a Response to Proposed Undisputed Facts ("RTPUF"), ECF No. 38-8, and various supporting materials. Armstrong does not dispute that Plaintiffs hold the copyrights to the Songs, or that the Songs were played at TLM on the dates in question. RTPUF ¶¶ 3-4, 11-13; Def's Resp. to Pls.' First Req. for Admis. ("First RFA"), ECF No. 35-20 ¶¶ 6-12. Armstrong argues, however, that summary judgment is precluded because the parties genuinely dispute whether the Songs were publicly performed without authorization. Resp. ¶¶ 9-13. In particular, Armstrong asserts that TLM obtained a license to publicly perform copyrighted works in BMI's repertoire under certain circumstances. Resp. ¶ 3; *see* Armstrong Aff. ¶ 3. Though Armstrong's arguments on this point are not entirely clear, Armstrong appears to argue that the possibility that this license allowed the performances of the Songs, coupled with the fact that Plaintiffs have not demonstrated that the Songs were not performed pursuant to the license, constitutes a genuine dispute of material fact.

Resp. ¶ 12. Armstrong further argues that he should not be held individually liable for any infringement, and that Plaintiffs are not entitled to the relief they seek. Resp. ¶¶ 14-20.

Plaintiffs have filed a reply to the Response ("Reply"), ECF No. 39, along with supporting materials. Defendant has filed a surreply to the Reply ("Surreply"), ECF No. 41, after the Court granted his motion requesting permission to do so. Finally, Defendant has filed a letter with the Court (the "Letter"), ECF No. 42, addressing the Surreply. The Court sets forth additional pertinent facts and further details about the parties' arguments in its discussion of the Motion.

## II.    DISCUSSION

### A.    Standard

A court must enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the

record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996). To show the existence of a genuine dispute, the nonmoving party must support its position with citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[,]" or show "that the materials cited by the movant do not establish the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). The court resolves factual controversies in favor of the nonmoving party; however, factual controversies require more than "conclusory allegations," "unsubstantiated assertions," or "a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quotation marks and citations omitted). Further, when reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh evidence. *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478-79 (5th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

   **B.    Analysis**

   The parties dispute whether the performances of the Songs at TLM infringed Plaintiffs' copyrights, whether Armstrong is individually liable for any infringement, and, if applicable, the appropriate relief. The Court addresses each of those issues in turn.

### 1.     Copyright infringement

"The United States Copyright Act bestows upon the owner of a copyright the exclusive

right to do or authorize the public performance of a copyrighted musical composition." *Stygian*

*Songs v. Johnson*, 776 F. Supp. 2d 233, 236 (N.D. Tex. 2011) (citation omitted); *see* 17 U.S.C. §

106(4). "Anyone who violates any of the exclusive rights of the copyright owner . . . is an

infringer." 17 U.S.C. § 501(a).

> In order to prove a copyright infringement claim, [a plaintiff] must show five elements:
> 1) originality and authorship of the copyrighted works involved;
> 2) compliance with the formalities of the Copyright Act
> 3) proprietary rights in the copyrighted works involved;
> 4) public performance of the copyrighted works involved; and
> 5) lack of authorization for public performance.

*Broad. Music, Inc. v. Hobi, Inc.*, 20 F.3d 1171, 1994 WL 144812, at *1 (5th Cir. Apr. 9, 1994)
(unpublished).

"Copyright registration certificates serve as prima facie evidence of the first three elements of an

infringement claim." *Broad. Music, Inc., v. Tex Border Mgmt., Inc*., --- F. Supp. 2d ----, 2014

WL 1314833, at *2 (N.D. Tex. Mar. 31, 2014) (citations omitted).

Plaintiffs argue that they have established the first three elements of infringement as a

matter of law because they have submitted copyright registration certificates and documentation

relating to the chain of ownership for each of the Songs. Mot. ¶ 10, Ex. A[5]; *see* PUF ¶¶ 1-4;

Howland-Kruse Decl. ¶ 4; Armstrong does not dispute that Plaintiffs hold the copyrights to the

Songs. *See* Resp. ¶ 11; RTPUF ¶¶ 1-4. The Court accordingly holds that Plaintiffs have

established the first three elements of their copyright infringement claim. *See Red Giant, Inc. v.*

*Molzan, Inc.*, Civil Action No. H-07-2657, 2009 WL 2242349, at *3 (S.D. Tex. July 24, 2009)

---

[5] The ECF documents numbered 35-2 through 35-16 contain copyright ownership and assignment information for
each of the Songs. These documents collectively comprise Exhibit A of the Motion.

(holding that copyright registration certificates met plaintiffs' burden of proof on summary judgment as to the first three elements of copyright infringement).

Though Plaintiffs argue that they are entitled to summary judgment on the remainder of their claim, Armstrong argues that he has raised genuine disputes of material fact with regard to the "public performance" and "lack of authorization" elements of copyright infringement. Resp. ¶ 11. The Court addresses those arguments in turn.

### a.      Public performance

Plaintiffs argue that they can prove as a matter of law that the Songs were publicly performed at TLM. Mot. ¶ 11. Robert Allman, an investigator employed by Plaintiffs, avers that he visited TLM on the dates in question. PUF ¶ 11; Stevens Decl. ¶ 10; March 2 Report at 1-13; March 3 Report at 6-13.[6] Allman made digital recordings of the music that was played during his visits and made written records of his observations. *Id*. During the course of his visit on March 2, Allman recognized and identified five of the Songs. PUF ¶ 11; Stevens Decl. ¶ 10; March 2 Report at 2. Allman transmitted the recordings from both of his visits to BMI, whereupon an employee of a BMI subsidiary subjected them to a computerized analysis that identified three additional Songs. PUF ¶ 13; Stevens Decl. ¶¶ 11-12; March 2 Report at 13-18; March 3 Report at 13-17. Separately, Joannah Carr, a BMI employee, also reviewed the recordings and independently identified fourteen of the Songs. PUF ¶ 12; Stevens Decl. ¶ 13; March 2 Report at

---

[6] In an evident oversight, Plaintiffs did not attach the March 3 Report to the Motion. After Armstrong's Response attacked the lack of summary judgment evidence regarding infringement on March 3, Plaintiffs simply attached the March 3 Report to their Reply without acknowledging in any way its initial absence. Only after the Court allowed Armstrong to file the Surreply, in which he argued that the exhibit comprising the March 3 Report should be stricken, did Plaintiffs concede in the Letter that they mistakenly failed to file the March 3 Report with the Motion.

The Court concludes that the March 3 Report is properly part of the summary judgment record, as that report is functionally identical to the March 2 Report and Armstrong has availed himself of the opportunity to respond. Any prejudice arising from the March 3 Report's initial absence has thus been cured. *See, e.g., Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir. 2004).

19-22; March 3 Report at 18-19. Based on this evidence, Plaintiffs argue that each of the fifteen Songs was publicly performed at TLM.

Though Armstrong does not dispute that the Songs were played at TLM, he nevertheless argues that Plaintiffs have not established as a matter of law that all the Songs were publicly performed. Resp. ¶ 13. Armstrong appears to acknowledge that the five Songs that Allman identified in person were publicly performed. *Id*. However, Armstrong avers that TLM had at one time entered into an agreement (the "Agreement") with Ecast, Inc., a company that "offered a background music subscription service whereby businesses like TLM are permitted to play otherwise copyrighted songs within their establishments" by means of an "internet jukebox." Armstrong Aff. ¶ 3; *see* Resp. ¶ 12. Armstrong asserts that because the BMI employees who identified the other ten Songs on Allman's recordings "cannot attribute the public performance of these songs" to a particular in-person performer, "Plaintiffs cannot prove these compositions were publicly performed *other* than on the internet jukebox covered by the performance agreement with Ecast, Inc.– that they were played by live performers." Resp. ¶ 13. Therefore, Armstrong argues, "a genuine material issue of fact exists as to whether these additional ten compositions were publicly performed without authorization." *Id*.; *see* Surreply ¶ 8.

Armstrong's argument fails for two reasons. First, Armstrong conflates the "public performance" and "lack of authorization" elements of copyright infringement. His assertion that the Songs may have been performed pursuant to a license bears on whether the public performance was unauthorized, not on whether the public performance occurred.

Second, an infringing public performance need not be played by live performers. The Copyright Act specifies that "[t]o 'perform' a work means to recite, render, play, dance, or act it,

either directly *or by means of any device or process*." 17 U.S.C. § 101 (emphasis added). "An impermissible public performance includes playing songs on records in a bar or music club." *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 78 (5th Cir. 1987) (citation omitted). Thus, so long as the Songs were publicly performed by any means, whether live or recorded, this element is satisfied.[7]

Because Armstrong fails to raise a genuine dispute of material fact as to whether the Songs were publicly performed, the Court holds that Plaintiffs have established the "public performance" element of their copyright infringement claim. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 322.

### b.    Lack of authorization

Plaintiffs argue that they are entitled to summary judgment on the "lack of authorization" element of copyright infringement. Mot. ¶ 12. In support of this argument, Plaintiffs have submitted the sworn declaration of Lawrence Stevens, an Assistant Vice President, Licensing, and custodian of records for BMI, who states that "BMI has not issued a license to any person authorizing the performance at [TLM] of any of the works alleged to have been infringed. Upon information and belief, none of the owners of the copyrights of any of said works has issued such a license to any person." Stevens Decl. ¶ 4.

Armstrong argues that the Songs may have been performed pursuant to a license contained in the Agreement. This, he claims, raises genuine disputes of material fact with regard to whether the performances lacked authorization, and therefore precludes summary judgment. *See* Resp. ¶¶ 10-12; Surreply ¶ 7.

---

[7] Moreover, contrary to Armstrong's argument, and to use his formulation, "Plaintiffs [*can*] prove these compositions were publicly performed *other* than on the internet jukebox covered by the performance agreement with Ecast, Inc." Resp. ¶ 13. The Court addresses this point below in its discussion of the "lack of authorization" element of copyright infringement.

As an initial matter, Armstrong states that TLM has been closed since November 3, 2013, when it was "locked-out" by its landlord for nonpayment of rent, and that he no longer has access to TLM's books and records. Armstrong Aff. ¶¶ 2-3. Armstrong seeks to use his affidavit, coupled with evidence that TLM made regular payments to Ecast, to prove the existence of the Agreement. *See* Resp. ¶¶ 2-4. The Court assumes without deciding that Armstrong's affidavit and the record of payments are competent summary judgment evidence of the existence of the Agreement.

The Armstrong Affidavit is the only record evidence regarding the Agreement, and its discussion thereof is paltry. It reads in pertinent part:

> In September of 2003, contemporaneous with the opening and on behalf of the Three Legged Monkey, I entered into a performance agreement with Ecast, Inc. To my understanding, Ecast, Inc., through the performance agreement, offered a background music subscription service whereby businesses like [TLM] are permitted to play otherwise copyrighted songs within their establishments. Pursuant to the performance agreement, a company called AJ Franz installed and serviced an "internet jukebox" at the Three Legged Monkey by and through which music could be accessed and played. The jukebox remained operational at [TLM] beginning in 2003 and continuing until sometime in 2012. During that time, [the Limited Partnership] paid Ecast, Inc. monthly from its operating bank account by automatic draft . . . . I understood that [the Limited Partnership's] payments to Ecast, Inc. included payments to BMI for the purpose [of] complying with copyrights.

*Id*. ¶ 3.

Crucially, Armstrong does not claim in his affidavit or argue in his briefs that the Songs were performed pursuant to the Agreement or that the performances were otherwise permitted. Indeed, the Armstrong Affidavit says nothing at all about the substance of the Agreement. Instead, Armstrong merely hypothesizes that the performances might have been permitted by the Agreement and argues that summary judgment is therefore inappropriate.

Specifically, Armstrong argues that three genuine disputes of material fact preclude summary judgment. Armstrong first argues that the parties dispute whether TLM obtained a license from BMI, albeit via Ecast as BMI's agent, "for public performance at [TLM]." Resp. ¶ 12. Armstrong next argues that they dispute "the extent of coverage/applicability of the [Agreement] (*i.e.*, to what public performances)." *Id*. Third, as discussed above, Allman identified five of the Songs during his visit to TLM on March 2, and noted that they were performed by a live band or a DJ. Armstrong asserts that because the BMI employees who identified the other ten Songs on Allman's recordings cannot attribute their performance to an in-person performer, "Plaintiffs cannot prove these compositions were publicly performed *other* than on the internet jukebox covered by [Agreement]." *Id*. ¶ 13. Therefore, Armstrong argues that the parties genuinely dispute "whether these additional ten compositions were publicly performed without authorization." *Id*.

Armstrong's arguments are unavailing. First, at issue is not whether TLM and/or BMI had agreements of some sort with Ecast, but whether the Songs were performed without authorization. Armstrong's affidavit artfully refrains from stating that the infringing performances were permitted by the Agreement. There is therefore no evidence in the record that the performances were authorized. Absent evidence that the Agreement bears upon the permissibility of the performances, any dispute over whether an agreement of some sort existed at all is not material. *See Sossamon*, 560 F.3d at 326 (citation omitted) (a genuine dispute of material fact is one whose "resolution in favor of one party might affect the outcome of the lawsuit").

Second, similarly, Armstrong's affidavit and the balance of the record contain no indication that the Agreement permitted performances by a live band or a DJ. While it is true that the precise contours of the Agreement are unknown, the Armstrong Affidavit makes it clear that the Agreement related to a "background music subscription service" and that pursuant to the Agreement, TLM operated an "internet jukebox." Armstrong Aff. ¶ 3. Armstrong's implication in his briefs that the Agreement may have allowed other types of performances therefore fails to conjure up a dispute of material fact. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little*, 37 F.3d at 1075) (the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence"). As Armstrong does not make even a "conclusory allegation" or an "unsubstantiated assertion" that the Agreement permitted the performances, his invocation of "some metaphysical doubt" as to their permissibility fails to raise a genuine dispute of material fact. *See id*.

Third, though Armstrong is correct that the BMI employees who reviewed Allman's recordings cannot independently attribute the performances of the Songs to a particular performer, Allman's undisputed reports unambiguously indicate that all of the Songs he recorded were performed by a live band or a DJ, and not via an internet jukebox or a background music subscription service. Specifically, Allman reported that the "Source" of each song whose playing he made note of was either "Live" or a "DJ." March 2 Report at 2-3; March 3 Report at 7. Each report describes the gender, race, and clothing of the members of the live band playing that night – "AX Duo" on March 2 and "Rein" on March 3 – as well as "DJ Mark," who performed on both nights.  March 2 Report at 1-2; March 3 Report at 6-7. The reports include pictures of the

performers at work, as well as a copy of AX Duo's business card, which advertises "Live Music." March 2 Report at 6-8, 12; March 3 Report at 11. In a section of the reports entitled "Recorded Music: Source and Type of Equipment Used," Allman checked only the box for "Computer Source," and not, for instance, "Music Service," "Digital Source," "Other," or anything else that might facially refer to an "internet jukebox." Allman explained that the "Source Verification Method" was "I witnessed equipment myself" and "DJ equipment viewed by myself," and that he "witnessed DJ Mark operating the equipment, laptop and digital electronic equipment," thereby demonstrating that the "computer source" he referred to was DJ Mark's equipment, not an "internet jukebox." March 2 Report at 1; March 3 Report at 6. Finally the reports specify that on March 2 the "Jukebox was never turned on" and that on March 3 the "Jukebox [was] not on." March 2 Report at 1; March 3 Report at 6. Allman's undisputed reports thereby indicate that during his visits to TLM, music was performed only by a live band or a DJ, and not via an "internet jukebox" or a "background music subscription service."

In sum, Armstrong fails to raise a genuine dispute of material fact regarding whether the performances were unauthorized.[8] The Court therefore grants summary judgment to Plaintiffs on

---

[8] Armstrong also pleaded, in substance, the affirmative defense that the performances were licensed. *See* Def.'s First Am. Ans. to Pls.' First Am. Verified Compl., ECF No. 26 ¶ 37. Because "[t]he existence of a license authorizing use of copyrighted material is an affirmative defense . . . [the defendant] bears the burden of proving the existence of a license." *Lulirama Ltd. v. Axcess Broad. Serv., Inc.*, 128 F.3d 872, 884 (5th Cir. 1997). To survive summary judgment, the nonmovant's "evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial." *Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citations omitted). Armstrong's mere hypothesis that the Agreement might have permitted the performances of the Songs would not suffice to sustain a finding at trial that the Songs were performed pursuant to a license. Therefore, Armstrong's pleaded affirmative defense is insufficient to preclude summary judgment in Plaintiffs' favor.

that element of their copyright infringement claim.[9] *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 322. Further, because Plaintiffs are entitled to summary judgment on each element of their claim, the Court holds that Plaintiffs are entitled to summary judgment that the performances of the Songs at TLM infringed Plaintiffs' copyrights. *See id*.

### 2.    Individual liability

Plaintiffs advance several alternative theories in support of their argument that Armstrong is individually liable for the infringing performances at TLM. Mot. ¶¶ 13-19; Reply ¶¶ 12-13. Armstrong argues only that he cannot be found individually liable because there are genuine disputes of material fact regarding infringement. Resp. ¶ 10.

"[A]ll participants in copyright infringement are jointly and severally liable as tortfeasors." *Fermata Int'l Melodies, Inc. v. Champions Golf Club, Inc.*, 712 F. Supp 1257, 1262 (S.D. Tex. 1989) (citations omitted), *aff'd* 915 F.2d 1567 (5th Cir. 1990). Generally speaking, "liability for copyright infringement falls not only on the person who actually performed the copyright[ed] music, but also on those who: (1) had the right and ability to control the infringing activity; and (2) had a direct financial interest in that activity." *EMI April Music, Inc. v. Jet Rumeurs, Inc.*, 632 F. Supp. 2d 619, 623 (N.D. Tex. 2008) (citations omitted). The Fifth Circuit has applied that test to determine whether a corporate officer is jointly and severally liable for copyright infringement by the corporation, *see Hobi*, 1994 WL 144812, at *2, and district courts

---

[9] BMI argues in its Reply that it granted a license to Ecast only to play music by means of a "digital jukebox," that Ecast was merely its licensee, not its agent, and that the Agreement therefore could not have authorized performances of the Songs by a live band or a DJ. Reply ¶ 6. BMI also argues that the Songs could not have been played via the internet jukebox because Ecast shut down its jukebox network on March 1, 2012, before the infringing performances took place. *Id.* ¶ 7. The Court need not reach these arguments because it finds, for the other reasons explained above, that Plaintiffs are entitled to summary judgment on this element of their copyright infringement claim.

in this circuit have applied it in a variety of similar circumstances. *See Tex Border Mgmt.*, 2014 WL 1314833, at \*3 (collecting cases). The Court therefore applies it as well.

Plaintiffs' undisputed summary judgment evidence amply demonstrates that Armstrong had the right and ability to control the infringing activity and a direct financial interest therein. Specifically, Armstrong admits that as a limited partner in the Limited Partnership, he hired, fired, and supervised employees at TLM. PUF ¶ 15; RTPUF ¶ 15; Def's Supp. Resp. to Pls.' Second Req. for Admis., ECF No. 35-22 ("Second RFA") ¶¶ 1-4. Armstrong admits that on the dates in question, he served as the Operations Manager at TLM, supervised employees, and thereby allowed musical compositions to be publicly performed. *See* PUF ¶ 16; RTPUF ¶ 16; Second RFA ¶ 17; First RFA ¶ 6; Def.'s Resp. to Pls.' Second Set of Interrog. ("Second Interrog.") ECF No. 35-23 ¶ 1. Armstrong also admits that he received money from TLM's revenue and/or profits on those dates. PUF ¶ 17; RTPUF ¶ 17; Second RFA ¶ 19; Second Interrog. ¶ 5. Finally, Armstrong admits that in sum, "as an owner of the [Limited Partnership], [he] was in charge of operations, allowed musical compositions to be played on [the relevant dates], supervised the employees of [the Limited Partnership] and derived a financial benefit from the operation of and musical compositions played at TLM on [the relevant dates]." PUF ¶ 18; RTPUF ¶ 18. The Court therefore finds that Armstrong had the right and ability to control the infringing activity and a direct financial interest therein, and accordingly holds that Armstrong is individually liable for the infringing performances. *See, e.g.*, *Tex Border Mgmt.*, 2014 WL 1314833, at \*3 (collecting cases holding that individuals with ownership interests and supervisory roles analogous to Armstrong's were individually liable for copyright infringement).

16

3.      **Relief**

Plaintiffs seek permanent injunctive relief, statutory damages, reasonable attorney's fees, and costs. Pertinent to those requests is whether the infringement was willful. *See* 17 U.S.C. §§ 502, 504-05. The record of interactions between BMI and Armstrong prior to the infringing performances sheds light on that question.

BMI asserts that between August 28, 2009, and March 2, 2012, it sent twenty-eight written communications to Armstrong by first-class mail, FedEx, UPS, fax, and email, variously requesting that he enter into a licensing agreement with BMI, alleging that infringing performances were taking place at TLM, and warning him of the consequences of copyright infringement. Stevens Decl. ¶¶ 3-6; ECF No. 35-19 at 1-43. The written communications were addressed to Armstrong at TLM's address, and the record includes evidence that at least seven of these communications were delivered to TLM. *See* ECF No. 35-19 at 1-2, 3-4, 5-6, 23-24, 25-26, 28-29, 30-31. Armstrong generally admits that between September 2009 and January 2013, BMI repeatedly informed him of the need to obtain its permission to publicly perform copyrighted works in its repertoire. PUF ¶ 7; RTPUF ¶ 7. Armstrong also does not claim that he failed to receive any or all of the communications. First RFA ¶¶ 19-49; *cf.* Armstrong Aff. ¶ 4. Moreover, Armstrong affirmatively asserts that, prior to the infringing performances, he was aware of the need to obtain a license to perform copyrighted music, because he claims that he understood that TLM's payments to Ecast included "payments to BMI for the purpose [of] complying with copyrights." Armstrong Aff. ¶ 3.

As Armstrong was aware of the need to obtain a license to perform copyrighted works, did not act upon repeated requests to do so, and sanctioned the performance of fifteen separate

copyrighted works over the course of two nights, March 2-3, 2012, the Court finds that he willfully infringed Plaintiffs' copyrights in the Songs.[10] *See, e.g., Stygian Songs*, 776 F. Supp. 2d at 239. In reaching that conclusion, the Court makes no finding that any infringement occurred at TLM before March 2, 2012. With those facts in mind, the Court considers Plaintiffs' requests for relief.

### a.    Injunctive relief

A court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502. "When an infringement occurs, the copyright owner is entitled to an injunction prohibiting further infringing performances." *Controversy Music, Inc. v. Down Under Pub Tyler, Inc.*, 488 F. Supp. 2d 572, 577 (E.D. Tex. 2007) (citations omitted). Thus, "[i]n short, an injunction is appropriate if liability has been established *and* if there is a continuing threat of further infringement of Plaintiffs' copyrights." *Tex Border Mgmt*., 2014 WL 1314833, at *5 (citations omitted).

Plaintiffs argue that despite the fact that TLM is no longer in operation, they require injunctive relief to protect them from future infringement in the event that Armstrong reopens TLM or opens another establishment. Mot. ¶¶ 21-23. Armstrong's argument against injunctive relief does not directly address the propriety of an injunction. Resp. ¶¶ 16-17. Instead, he argues only that the Motion should be denied and that any infringement on his part was not willful. *Id*. ¶ 17.

---

[10] BMI also asserts that its licensing personnel telephoned TLM seventy-three times and "on a number of occasions spoke to persons" associated with its operations. Stevens Decl. ¶ 9. As the record contains no other evidence regarding these telephone communications, such as how many of the calls were completed and to whom the employees spoke, the Court does not rely upon them in concluding that Armstrong willfully infringed Plaintiffs' copyrights.

Here, liability having already been established, the Court holds that the continuing threat of further infringement warrants injunctive relief. Armstrong's willful copyright infringement, coupled with his "blatant disregard of Plaintiffs' repeated entreaties to cease infringement," demonstrates that copyright law alone is not sufficient to deter Armstrong from committing acts of infringement.[11] *See Midtown Beverage,* 2013 WL 3554406, at *3 (citation omitted). The fact that TLM was "locked-out" for nonpayment of rent on November 3, 2013 and is not currently operating does not lessen Plaintiffs' need for injunctive relief. No evidence in the record indicates that Armstrong will not reopen TLM, whether at its past location or elsewhere. *Cf. Red Giant*, 2009 WL 2242349, at *10 (granting permanent injunction against closed business in light of its plans to reopen). Moreover, the fact that Armstrong may open another establishment that offers musical entertainment distinguishes the Case from *Tex Border Management*, in which the court rejected a request for injunctive relief against a corporate entity that no longer existed. *See Tex Border Mgmt.*, 2014 WL 1314833, at *6. The Court accordingly holds that an injunction will issue prohibiting Armstrong from committing further copyright infringement of BMI-licensed works.

### b.     Statutory damages

The owner of copyrights which have been infringed may elect to recover damages in an amount determined by statute. 17 U.S.C. § 504(a). Plaintiffs seek such statutory damages. Mot. ¶ 24. For each work that has been infringed, the owner may be awarded damages of not less than $750 and not more than $30,000, in an amount the court considers just. 17 U.S.C. § 504(c)(1).

---

[11] The Court again stresses that it makes no finding as to whether TLM hosted infringing performances before March 2, 2012. However, Plaintiffs' letters to Armstrong were undoubtedly "repeated entreaties to cease infringement." *See, e.g.*, ECF No. 35-19 at 30-31 (admonishing Armstrong that "in the absence of a license agreement with BMI . . . you must cease all use of BMI licensed music . . . . The continued use of music in the BMI repertoire without authorization will result in copyright infringement").

Though the Copyright Act allows the Court to increase the amount of statutory damages to as much as $150,000 per work because the infringement was willful, Plaintiffs seek total statutory damages of $90,000, or only $6,000 for each of the fifteen infringed works. *id*. § 504(c)(2); Mot. ¶ 27.

Plaintiffs argue that $90,000 is an appropriate award because it is "approximately three times the amount Plaintiffs would have received in licensing fees from Armstrong had [TLM] been properly licensed from the date BMI first contacted Armstrong to the date the business closed." Mot. ¶ 27.  Plaintiffs cite numerous cases holding that three times the amount the copyright owner would have received in licensing fees, or between $5,000 and $10,000 per infringed work, were appropriate awards. *Id*. ¶¶ 28-29. Armstrong argues that the Court should assess damages at the low end of the statutory range because any infringement was not willful, the fact "that Armstrong had the [Agreement] in place evidences an attitude of compliance with copyright law, not the other way around," and BMI indirectly received revenue from Armstrong's payments to Ecast. Resp. ¶¶ 18-19. Armstrong also argues that any fees he paid to Ecast should be credited against the damages award. *Id*.

The Court rejects Armstrong's arguments. There is no evidence that Armstrong's payments to Ecast "evidence[d] an attitude of compliance with copyright law." Those payments merely gave TLM access to the Ecast jukebox network, which TLM could not obtain without payment; there is no indication that Armstrong has ever paid a standalone licensing fee for the purpose of complying with copyright law. Though Armstrong "understood that [TLM's] payments to Ecast, Inc. included payments to BMI for the purpose [of] complying with copyrights," Armstrong Aff. ¶ 3, any such payments to BMI did not reflect any action on

Armstrong's part and are not probative of his attitude towards copyright law. By contrast, when Armstrong had the opportunity to sanction the performance of the Songs without paying licensing fees, he did so. The Court therefore finds that Armstrong's decision to sanction the infringing performances of the Songs, despite years of requests that he enter into a licensing agreement, is indicative of his dismissive attitude toward copyright law and does not militate in favor of imposing minimal damages. By the same token, the Court will not credit Armstrong for any payments he made to Ecast. Those payments were for access to the internet jukebox service, which is not alleged to have infringed Plaintiffs' copyrights and has no bearing on the infringing performances at issue.

The Court also rejects Plaintiffs' contention that $90,000 is an appropriate award for the reason that it is approximately three times the licensing fees Armstrong should have paid from the date of Plaintiffs' first letter on August 28, 2009, through when TLM closed on November 3, 2013. *See* Mot. ¶ 27. Even assuming *arguendo* that TLM offered an uninterrupted string of infringing performances from August 28, 2009 through November 3, 2013, Plaintiffs point to no evidence in the record of what licensing fees TLM rightfully should have paid. Moreover, as discussed, the Court makes no finding that any that infringement occurred before March 2, 2012.[12] Thus, Plaintiffs fail to justify why the relevant period should run from when they first contacted Armstrong in 2009.

The Court nonetheless concludes that Plaintiffs should be awarded their requested damages of $6,000 per Song for a total of $90,000 in statutory damages. Such an amount is at the

---

[12] Some of BMI's letters to Armstrong list the license fees it claimed to be owed, which are indeed approximately one-third of $90,000. *See, e.g.*, ECF No. 35-19 at 45. Even if these letters accurately state the fees BMI would have charged Armstrong to enter into some kind of license agreement for some period of time, those figures, and therefore the $90,000 request, nevertheless rest on the unproven assumption that TLM engaged in a pattern of infringement dating back to 2009.

low end of the statutory damages range, and it is consonant with, or less than, the awards granted by other district courts in Texas in recent years in cases similar to this one. *See Tex Border Mgmt.*, 2014 WL 1314833, at *7 ($20,000 per infringement); *Midtown Beverage*, 2013 WL 3554406, at *4 ($3,000); *Stygian Songs*, 776 F. Supp. 2d at 238 ($10,000); *Red Giant*, 2009 WL 2242349, at *7 ($7,500); *Jet Rumeurs,* 632 F. Supp. 2d at 626 ($3,500); *Down Under Pub*, 488 F. Supp. 2d at 579 ($5,000). The Court further believes that $6,000 per infringement is appropriate because it is just and sufficient to deter future copyright violations while promoting respect for the law. *See Down Under Pub*, 488 F. Supp. 2d. at 579 (granting award of $5000 per infringement).

### c.      Attorney's fees and costs

17 U.S.C. § 505 allows a court, in its discretion, to award the prevailing party in a copyright infringement action its full costs, including attorney's fees. "The Fifth Circuit has acknowledged that an award of attorneys' fees in copyright cases is within the discretion of the trial court, but has held that the award of attorneys' fees in copyright cases is the rule rather than the exception, and should be awarded routinely." *Compaq Computer Corp. v. Ergonome Inc.,* 387 F.3d 403, 411 (5th Cir. 2004) (*citing Hogan Sys., Inc. v. Cybresource Int'l, Inc.,* 158 F.3d 319, 325 (5th Cir. 1998); *McGaughey v. Twentieth Century Fox Film Corp.,* 12 F.3d 62, 65 (5th Cir. 1994)). Plaintiffs argue that an award of attorney's fees and costs is called for "in light of Armstrong's deliberate misconduct and the statutory purpose of encouraging private enforcement of the Copyright Act." Mot. ¶ 31. Armstrong makes no substantive argument that an award of attorney's fees is unwarranted. The Court agrees with Plaintiffs, and holds that they are entitled

to their reasonable attorney's fees and costs. *See Midtown Beverage*, 2013 WL 3554406, at \*4; *Red Giant*, 2009 WL 2242349 at \*7.

Plaintiffs do not specify in the Motion the amount of attorney's fees and costs they seek. Instead, Plaintiffs refer the Court to the affidavit of their attorney, Francisco Ortega. *See* Mot. ¶ 31; Aff. in Supp. of Req. for Atty's Fees in Pls.' Mot. for Summ. J. ("Ortega Aff."), ECF No. 35-25. Plaintiffs assert that the Ortega Affidavit sets forth "the attorney's fees and costs billed to Plaintiffs," Mot. ¶ 31, but it does not. Ortega states only that he performed a lengthy list of tasks, that his hourly rate is $210, and that a total of $25,271.94 would be a reasonable fee for the services he rendered in the Case through the summary judgment stage. Ortega Aff. 2-4. Additionally, Ortega does not state how much time he spent on the Case, whether in the aggregate or on a task-by-task basis, and he makes no reference to Plaintiffs' other costs. For those reasons, Plaintiffs' request for fees and the Ortega Affidavit are not in compliance with Local Rule CV-7(j)(1), which governs requests for attorney's fees. Further, it is the practice of this Court to entertain requests for attorney's fees only after the entry of final judgment. The Court therefore declines to grant Plaintiffs an award of attorney's fees and costs at this time.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment, ECF No. 34, is **GRANTED**.

It is hereby **ORDERED** that Plaintiffs, jointly and severally, shall recover statutory damages from Armstrong of $6,000 for each Song performed at TLM in violation of Plaintiffs' copyrights, for a total of $90,000 in statutory damages.

**IT IS FURTHER ORDERED** that Plaintiffs, jointly and severally, shall recover from Armstrong their costs and reasonable attorney's fees, in an amount to be determined pursuant to the applicable law and the procedures set forth in Local Rule CV-7(j).

**IT IS FURTHER ORDERED** that Armstrong and his agents, servants, employees, and all persons acting under his permission or authority shall be permanently enjoined and restrained from infringing in any manner the copyrighted musical compositions licensed by BMI.

**IT IS FURTHER ORDERED** that Armstrong show cause by June 16, 2014 why his third-party complaint against Three Legged Monkey, L.P. should not be dismissed for failure to timely effect service of process.

Final judgment shall issue separately.

**SO ORDERED**.

**SIGNED** this 30th day of May, 2014.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE